```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------X
DANIELLE STULL                                              **MEMORANDUM & ORDER**

                        Plaintiff,                          16-CV-2682 (DRH) (AKT)
        -against-


NORTH SHORE-LIJ CARECONNECT
INSURANCE AGENCY, INC.,

                        Defendant.
----------------------------------------------------------X
```

**APPEARANCES:**

**For Plaintiff:**
Jonathan A. Tand and Associates, P.C.
990 Stewart Avenue, Suite 225
Garden City, New York 11530
By:     John C. Luke, Jr., Esq.

**For Defendant:**
Klein Zelman Rothermel Jacobs & Schess LLP
485 Madison Avenue, Suite 1301
New York, New York 10022
By:     Jane B. Jacobs, Esq.
        Alexander W. Bogdan, Esq.


**HURLEY, Senior District Judge:**

Plaintiff Danielle Stull ("Plaintiff" or "Stull") commenced this action against defendant CareConnect Insurance Company, Inc. ("Defendant" or "CareConnect"), incorrectly named herein as North Shore-LIJ CareConnect Insurance Agency, Inc., asserting claims of discrimination and retaliation pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq*. ("Title VII"), the Americans with Disabilities Act, 42 U.S.C. §§ 12111 *et. seq.* ("ADA"), and the New York State Human Rights Law, N.Y. Exec. Law §§ 296 *et seq.*

("NYSHRL"). Presently before the Court is Defendant's motion for summary judgment. For the reason set forth below, the motion is granted.

## BACKGROUND

The following facts are undisputed unless otherwise noted.

### I. The Parties

CareConnect is a health insurance company incorporated and licensed in New York. Through a series of parent companies, it is a wholly-owned subsidiary of Northwell Health and its employees are subject to the North Shore LIJ Health System Non-Discrimination and Non-Harassment Policy. That policy provides that Careconnect "will not tolerate unlawful discrimination or harassment against its employees by anyone, including any employees' age, race, creed/religion, color, national origin, alienage or citizenship status, sexual orientation, military or veteran status, sex/gender, gender identity, disability, genetic predisposition or carrier status, marital status, partnership status, and victim of domestic violence, or any other protected status" and "does not tolerate retaliation against any employee for making a complaint about or opposing discrimination or harassment or for cooperating, assisting or participating in an investigation of a discrimination." (Pl.'s 56.1 Statement ¶¶ 1-4.)

Plaintiff began working for Care Connect in February 2014 as a project manager at a salary of approximately $120,000 and reported to Stephen Noe ("Noe"). She "was maybe eight weeks" pregnant at that time. In May 2014, when she suffered a still birth, CareConnect was very supportive giving her as much time as she needed. (Pl.'s 56.1 Statement ¶¶ 5-8.)

### II. Plaintiff is Promoted

In April 2015, Plaintiff was offered a two-step promotion to the position of Director of Quality Improvement, reporting to the Chief Medical Officer, Dr. Alan Bernstein ("Bernstein"),

who interviewed her and recommended her promotion. Although she initially declined the promotion, she was persuaded to take the position by CareConnect CEO Alan Murray ("Murray") after the two spoke. Plaintiff explained that she did not want to report to Bernstein because she "felt he did not have the knowledge or trust of his colleagues to implement the quality improvement program the way it needed to be implemented" and she would need Murray's support if there were "any issues where [she was] not able to move things because of Dr. Bernstein." After Murray promised and then, at Stull's request, swore that he would "support [her] 100 percent and [she would have him] to be able to go to escalate things to", she accepted the position. (Pl.'s 56.1 Statement ¶¶ 10-19.)

As Director, Stull received a $20,000 promotion and was responsible for overseeing the operations of the Care Coordination and Utilization Management departments, supervising eight employees, having previously supervised none. Following her promotion, Stull and Bernstein met weekly. (Pl.'s 56.1 Statement ¶¶ 20-21, 37.)

### III.  Plaintiff's Pregnancy

Plaintiff learned that she was pregnant in or about the third week in April, one week before her promotion became effective. She announced her pregnancy generally to others at CareConnect in July 2015. She admits that no one at Care Connect made any negative statements to her about people with disabilities or about her being female; nor did anyone at CareConnect say to her they were unhappy she was pregnant. During her tenure at least ten of the other 100 employees were pregnant. (Pl.'s 56.1 Statement ¶¶ 22-30.)

### IV.  Stull's September 2015 Meeting with Murray

In September 2015, Stull met with Murray to discuss what she perceived to be Bernstein's failure to support an initiative. During that meeting she did not raise any concerns

about Bernstein discriminating against her or mistreating her. Plaintiff claims that during this meeting Murray said to her "everyone around here is working very hard" but made no comment to Plaintiff during the meeting that she was not working hard enough. (Pl.'s 56.1 Statement ¶¶ 33-36.)

V.      **Stull's Interactions with Bernstein**

Bernstein and Stull had a conversation about her upcoming maternity leave in October 2015 in which Bernstein asked her if she intended to return to work following her leave. She replied, "I'm planning on coming back but it has crossed my mind being a first-time mom that I don't know if I want to continue to work, but no matter what my decision is, I will be coming back to work." According to Plaintiff, during this conversation Bernstein told her that "people think you're slacking" and that Stull has "been taking too much PTO [paid time off]." At her deposition she testified that when she asked Bernstein why people thought she was slacking, "he mentioned that I was taking too much PTO, that I was leaving work early." When he commented about her PTO, she informed Bernstein for the first time that she had a high-risk pregnancy.[1] According to Stull, at an unspecified time after the meeting, Bernstein said "he was going to have a senior leadership meeting and will make sure that everyone knows she is not slacking." She did not use the word discrimination during this conversation with Bernstein. (Pl.'s 56.1 at ¶¶ 37-51.)

During that same conversation, Bernstein said that CareConnect was "going to hire someone who would directly report to [Stull], a senior QI manager who could basically do everything [she] was doing" and asked her to create a job description for the position. He

---

[1] The summary of this conversation comes from Plaintiff's deposition. The Court notes that her deposition testimony of the conversation differs from the allegations regarding this conversation contained in the complaint and her EEOC charge.

mentioned that this position would replace two other positions. According to Stull these were two unfilled positions that she was trying to hire for and she felt that would actually harm the department to take those two positions away to hire someone for the position referenced by Bernstein. According to Plaintiff, she worked nights and weekends and identified the lack of middle management as part of the reason she could not get all her work done but she disagreed with the contention that a Senior QI Manager would help. No one was hired for the position during Plaintiff's tenure at CareConnect. (Pl.'s 56.1 at ¶¶ 52- 59.)

### VI. Stull's Meeting with Howell

On October 23, 2015, Stull met with Kathy Howell ("Howell"), CareConnect's Chief Legal Officer, someone Stull "felt was a good person to go to and ask for advise on how to kind of handle the situation that [she] was going through." (Stull Dep. At 101:10-13.) According to Plaintiff the two "kind of just chatted;" she told Howell that she was "was upset that [Dr. Bernstein] mentioned, you know, that people were saying that I was slacking because I was taking too much PTO. I mentioned to her that I was high-risk and I had to take time for my doctor appointments, and I talked to her about the whole job thing; that they were trying to replace me – that I felt like they were trying to replace me." Plaintiff further contend that she complained about alleged discrimination because of her pregnancy but admits that she did not use the word "discrimination" in her conversation with Howell and never made any complaints concerning discrimination to harassment to CareConnect's Human Resources Department; she also admits that she felt better after the conversation with Howell. (Pl.'s 56.1 ¶¶ 60-64; Stull Dep. 101:12-13.)

### VII. Staff Bonuses

Stull had wanted to promote two of her subordinates, Mr. Baker and Ms. Martino. When Plaintiff was unable to do so, she told Dr. Bernstein that she "wanted to give them at least something of value to say we value everything that you have been doing and all your hard work.'" Dr. Bernstein suggested a one-time bonus to show them that they were valued even though they did not get promoted. On November 4, 2015, Bernstein sent an email to Stull approving the bonuses, copying the Director of Human Resources, Carol DeSantie ("DeSantie"). DeSantie responded that the bonus needed to be confirmed by Daniel Jorgenson ("Jorgenson"), CareConnect's Chief of Staff, and offered to secure that approval. DeSantie emailed Bernstein on November 6 that the bonuses had been approved and asked to be informed when the recipients were told about them so she could submit the bonuses for payment.Bernstein so advised Stull and suggested they present the bonuses together but Stull said she preferred to tell them about the bonuses herself. Several days later, Plaintiff emailed DeSantie asking when Baker and Martino would receive the bonuses. DSantie asked if the recipients had been advised of the bonuses as she needed to confirm that before submitting the bonuses to payroll. Stull replied that she had met with Mr. Baker and spoken on the phone with Ms. Martino. (Pl.'s 56.1 at ¶¶ 65-74.)

### VIII. Accommodations for Stull during her Pregnancy

During her pregnancy, Stull's requests to work from home or for time off were never denied. Although she was initially scheduled to begin an unpaid maternity leave in December 2015, at her request the date of her leave was moved up two weeks into November 2015. Just prior to the rescheduled beginning of her maternity leave, she offered to start her leave a week later than expected so she would be available to troubleshoot any problems her department might

have with a new software platform. Bernstein agreed to have Plaintff work from home that one week. She worked from home and was paid. Stull last worked at CareConnect on November 27, 2016. (Pl.'s 56.1 at ¶¶ 75-81.) No one at Care Connect ever told Plaintff that she was going to lose her job when she went out on leave, that her job was in jeopardy, or that she would be replaced. Aside from bed rest during the last week or so of her pregnancy, Plaintiff had no physical restrictions during her pregnancy. (Pl.'s 56.1 ¶¶ 74-83.)

IX.     **Chief of Staff's Criticism of Stull**

On December 1, 2105 CareConnect's Chief of Staff Jorgenson, sent an email about Stull to Bernstein and Murray. While Defendant contends that Plaintiff was copied on the email, Plaintiff asserts she learned of it when one of the recipients copied her on their reply. In any event, the email addressed two matters. First, Jorgenson claimed that Stull provided a mailing to the marketing department after the deadline. Second, with reference to the bonus to Martino, he stated that Stull "lied to [DeSantie] and manipulated her into giving Noelle Martino a bonus while [Martino] was on FMLA" and that Martino should not have been issued the bonus because no adjustments to a person's pay could be made while the employee is on leave. Bernstein responded that DeSantie told him that a bonus could not be issued while someone was on FMLA so he assumed the check had not gone out. Plaintiff also responded, writing that "both Mike and Carol's [sic] bonuses were approved after Noelle returned from maternity leave. I think it is quite disgusting that you think I manipulated someone." (Pl.'s 56.1 ¶¶ 84-91.)

Ms. Martino had been scheduled for a maternity leave from September 2 to November 24, 2015, and did not return to the office until December 1, 2015, the same day as Mr. Jorgenson's email. Upon investigation, CareConnect learned that Ms. Martino had returned to

CareConnect's payroll on October 19, 2015, almost six weeks ahead of schedule, working from home after she had her baby. (Pl.'s 56.1 ¶¶ 92-94.)

## X. Events After Jorgenson's Email

On December 23, 2015, an attorney on behalf of Plaintiff sent a letter to CareConnect enclosing a Charge of Discrimination that had been filed with EEOC on December 18, 2017. The Charge was signed by Plaintiff on December 7, 2015, approximately one week after she began maternity leave.

On February 27, 2016, Plaintiff sent a letter to Care Connect stating she would not be returning to work. After receipt of the letter, DeSantie responded stating:

> We received your letter dated February 27, 2017 concerning your desire not to return to work as we had previously agreed. Please understand that we strongly disagree with your summary of events relating to your pregnancy/pregnancy leave. As explained to you in multiple communications, your position as Director, Quality Performance Improvement has remained open, and we had – up until we received your February 27th letter – planned for you to return to that role. We do, however, respect your choice not to return to work.
> In the event that you reconsider, and/or want to discuss the matter further, we remain willing to do so. Otherwise, and unless we hear differently from you, we accept your February 27th letter as a resignation.
>
> We thank you for your service to CareConnect.

(Pl.'s 56.1 ¶¶98-99.)

According to Defendant, Stull's position was not filled after she resigned. Plaintiff contends that Defendant hired a person to perform her job but just changed the title and that it advertised this position while she was on maternity leave. However, as discussed below, she has no inadmissible evidence to support that assertion.

## DISCUSSION

## I. Summary Judgment Standard

Summary judgment pursuant to Rule 56 is appropriate only where admissible evidence in

the form of affidavits, deposition transcripts, or other documentation demonstrates the absence of a genuine issue of material fact, and one party's entitlement to judgment as a matter of law. *See Viola v. Philips Med. SYS. of N. Am.*, 42 F.3d 712, 716 (2d Cir. 1994). The relevant governing law in each case determines which facts are material; "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). No genuinely triable factual issue exists when the moving party demonstrates, on the basis of the pleadings and submitted evidence, and after drawing all inferences and resolving all ambiguities in favor of the non-movant, that no rational jury could find in the non-movant's favor. *Chertkova v. Conn. Gen'l Life Ins. Co.*, 92 F.3d 81, 86 (2d Cir. 1996).

To defeat a summary judgment motion properly supported by affidavits, depositions, or other documentation, the non-movant must offer similar materials setting forth specific facts that show that there is a genuine issue of material fact to be tried. *Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996). The non-movant must present more than a "scintilla of evidence," *Del. & Hudson Ry. Co. v. Consol. Rail Corp.*, 902 F.2d 174, 178 (2d Cir. 1990) (*quoting Anderson*, 477 U.S. at 252) (internal quotation marks omitted), or "some metaphysical doubt as to the material facts," *Aslanidis v. U.S. Lines, Inc.*, 7 F.3d 1067, 1072 (2d Cir. 1993) (*quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)) (internal quotation marks omitted), and cannot rely on the allegations in his or her pleadings, conclusory statements, or on "mere assertions that affidavits supporting the motion are not credible." *Gottlieb v. Cnty. of Orange*, 84 F.3d 511, 518 (2d Cir. 1996) (internal citations omitted).

The district court considering a summary judgment motion must also be "mindful . . . of the underlying standards and burdens of proof," *Pickett v. RTS Helicopter*, 128 F.3d 925, 928

(5th Cir. 1997) (citing Anderson, 477 U.S. at 252), because the "evidentiary burdens that the respective parties will bear at trial guide district courts in their determination of summary judgment motions." *Brady v. Town of Colchester*, 863 F.2d 205, 211 (2d Cir. 1988). "[W]here the nonmovant will bear the ultimate burden of proof at trial on an issue, the moving party's burden under Rule 56 will be satisfied if he can point to an absence of evidence to support an essential element of the nonmoving party's claim." *Id*. at 210-11. Where a movant without the underlying burden of proof offers evidence that the non-movant has failed to establish her claim, the burden shifts to the non-movant to offer "persuasive evidence that his claim is not 'implausible.'" *Id.* at 211 (citing *Matsushita*, 475 U.S. at 587).

## II. Framework for Analysis of Discrimination Claims

While discrimination claims under the ADA and Title VII are generally fact-specific inquiries, "summary judgment may be appropriate even in the fact-intensive context of discrimination cases." *Abdu-Brisson v. Delta Airlines, Inc.*, 239 F.3d 456, 466 (2d Cir. 2001). Claims under both statutes, as well as claims under the NYSHRL, are analyzed under the three-part, burden shifting framework set out by the Supreme Court in *McDonnel Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973). *Id.* To prevail on a discrimination claim, a plaintiff must first establish a prima facie case of discrimination. *McDonnel Douglas*, 411 U.S. at 802. Once the plaintiff has made out a *prima facie* case, "the burden then must shift to the employer to articulate some legitimate, nondiscriminatory reason for the employee's rejection." *Id.* Examples of legitimate, nondiscriminatory reasons are poor performance, being the subject of a complaint, unprofessional conduct, and causing personnel issues. *See, e.g.*, *Gorzynski v. Jetblue Airways Corp., v. JetBlue Airways Corp.*, 596 F.3d 93, 107 (2d Cir. 2010). If the employer is able to do so, then the burden shifts back to the plaintiff to prove that the employer's stated reasons are

pretext and that discrimination was the true reason for the adverse employment action. *See id.*; *see also Abdu-Brisson*, 238 F.3d at 466.

To establish a prima facie case of discrimination, a plaintiff must show that (1) she is within the protected class, (2) she was qualified for the position, (3) she experienced adverse employment action, and (4) such action occurred under circumstances giving rise to an inference of discrimination. *Testa v. CareFusion*, 2018 WL 1611378, at *5 (E.D.N.Y. Apr. 3, 2018) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)); *see also Gorzynski*, 596 F.3d at 107 (2d Cir. 2010) (citing *Carlton v. Mystic Transp., Inc.*, 202 F.3d 129, 134 (2d Cir. 2000). Plaintiff's burden in establishing a prima facie case of discrimination "is not a heavy one." *Gorzynski*, 596 F.3d at 107.

### III. Plaintiff's Affidavit

Preliminarily, the Court must consider the extent to which, if at all, consideration of the affidavit submitted by Plaintiff's in opposition to Defendant's motion should be considered.

Affidavits of witnesses who were deposed are disfavored on summary judgment. *See Bright v. Coca-Cola Refreshments USA, Inc.*, 639 Fed. App'x 6, 8 (2d Cir. 2015) (citing *Perma Research & Dev. Co. v. Singer Co.*, 410 F.2d 572, 578 (2d Cir. 1969)). "[F]actual allegations that might otherwise defeat a motion for summary judgment will not be permitted to do so when they are made for the first time in the plaintiff's affidavit opposing summary judgment and that affidavit contradicts her own prior deposition testimony." *Brown v. Henderson*, 257 F.3d 246, 252 (2d Cir. 2001).

There are numerous instances in which the affidavit submitted by Stull contradicts her deposition testimony. For example, in her affidavit she states that she "was referred to

derogatorily after her pregnancy was announced." In contrast, the following is taken from her deposition:

> Q: . . . [B]ut just so the record is absolutely clear, no one ever made a negative comment to you relating to your pregnancy is that correct?
> A. In the context of saying directly "I'm unhappy you're pregnant," those words, no.
> Q. Ma'am, I'm asking you a really specific direct question. Who made a negative statement, if anyone, about the fact that you were pregnant?
> A. No one.

(Stull Dep. 64:12-19, 206:10-19.)

But contradicting deposition testimony is not the only problem with the affidavit submitted by Plaintiff. The affidavit is long on generalities but short on specifics. For example, while she states she was referred to derogatorily after her pregnancy was announced, she does not provide specifics such as who made the statement, when it was made and what the statement was. Similarly, she states that she complained to Bernstein about discrimination because she knew questioning her PTO and "slandering her work efforts after her pregnancy became known was inappropriate for the workplace" but does not state when this alleged conversation with Bernstein took place. "Statements[, such as these,] that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment." *Griffin v. Ambika Corp.*, 103 F. Supp. 2d 297, 308 (S.D.N.Y. 2000); *accord Fincher v. Depository Trust & Clearing Corp.*, , 2008 WL 4308126, at *3 (S.D.N.Y. Sept. 17, 2008), *aff'd*, 604 F.3d 712 (2d Cir. 2010) (A plaintiff's self-serving statement, without direct or circumstantial evidence to support the charge of discrimination, is also insufficient.").

Her affidavit statements concerning the alleged posting of her position while she was on maternity leave are similarly problematic. For example she states "[w]hile I was on maternity leave, the defendant posted a job with the title 'Senior Director of Quality.' The job description

matched my job, save for one line regarding collaboration within the department." However, no evidence such as the posting and Plaintiff's job description are submitted to support that conclusory assertion.[2] Further, she states that "co-workers called me to tell me that my job had been posted under a 'Senior Director' title." Also a colleague from another organization called to tell her that one of the colleague's co-workers interviewed for the Senior Director of Quality position while Stull was on maternity leave and during the interview that co-worker was told by Defendant's Vice President of Medical Management that "she was there to interview to replace [Plaintiff]. (Stull Aff. ¶¶ 21-22.) Uncorroborated sources, hearsay and other inadmissible evidence may not be relied on to defeat summary judgment. *See Crawford v. Dep't of Investigation*, 2007 WL 2850512, at *2 (S.D.N.Y. Oct. 1, 2007), *aff'd*, 324 Fed. App'x 139 (2d Cir. 2009).

Accordingly, to the extent that portions of Plaintiff's affidavit either contradict her deposition testimony, are conclusory, or rely on hearsay or other inadmissible evidence, they have not been relied upon by the Court.

## IV. The Parties' Contentions

In support of its motion, CareConnect argues that with respect to Stull's discrimination claims (1) there was no adverse action; (2) there is no evidence from which to infer

---

[2] Plaintiff does cited a cropped version of deposition testimony of DeSantie, CareConnect's Director of Human Resources, for the proposition that Plaintiff's position and the Senior Director position are the same. The entirety of De Santis' deposition testimony does not support that assertion. It reads as follows:

    Q.    [W]hat is the difference other than pay?
    A.    I don't think there's much difference in terms of other than the name. I don't know.
           I don't know specifically the details, but I would say other than the name I don't know.
           I don't know the nuances.
    . . .
    Q.    Are the job specs of the senior manager of quality the same as the job specs
           of the director of quality?
    A.    I don't have the details of the nuances of the differences of those jobs.
    Q.    Okay
    A.    I couldn't speak to that.

(De Santis Dep. (Ex. A to Luke Aff.) at 22:25-24:3.)

discrimination; (3) plaintiff is not disabled; and (4) it did not aid and abet discrimination. As to the claim for retaliation, it maintains there is no factual basis for the claim, Stull did not engage in protected activity, and Care Connect took no adverse action against her.

Plaintiff responds that adverse action can be found though an aggregation of acts or constructive discharge and maintains there is sufficient evidence to support her retaliation claim. Notably, Plaintiff does not address in her submissions whether she was disabled under the ADA and therefore her claim for disability discrimination is dismissed as abandoned.

V.     **Whether Plaintiff Suffered an Adverse Employment Action**

As noted earlier, to support her claims of gender/discrimination and retaliation, she must provide evidence that she suffered an adverse employment action. "[A]n 'adverse action' is 'more disruptive than a mere alteration of job responsibilities.'" *Miller v. Praxair, Inc*. 408 Fed. App'x 408, 410 (2d Cir. 2010) quoting *Galabya v. N.Y.C. Bd. Of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000). "[T]ypical examples of actionable adverse employment actions include termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, or significantly diminished material responsibilities." *Id.* (internal quotation marks omitted)

Here Stuff asserts that the adverse action she suffered was "her constructive discharge as the result of the aggregation of acts taken against [her] before and while she was on maternity leave . . . ." (Pl.'s Opp. Mem. at 4.) She further maintains that even in the absence of constructive discharge, acts may be aggregated to satisfy the requirement of an adverse action.

First to be addressed is the claim of constructive discharge. "[A]n employee is constructively discharged when his employer, rather than discharging him directly, intentionally creates a work atmosphere so intolerable that he is forced to quit involuntarily." *Petrosino v. Bell*

*Atlantic*, 385 F.3d 210, 229 (2d Cir.2004). "Case law generally focuses on two parts of this standard: the employer's intentional conduct and the intolerable level of the work conditions." *Id*. The latter issue is "assessed objectively by reference to a reasonable person in the employee's position." *Id.* (citing *Pennsylvania State Police v. Suders*, 542 U.S. 129, 141, 124 S.Ct. 2342, 159 L.Ed.2d 204 (2004)). "Constructive discharge claims face a 'demanding" standard, 'even higher than that required to prevail on a hostile environment claim'." *Pryor v. Jaffee & Asher, LLP*, 992 F. Supp. 2d 252, 262 (S.D.N.Y. 2014) (quoting *Miller v. Praxair, Inc.*, 408 Fed. App'x 408, 410 (2d Cir.2010) (summary order) and *Mandel v. Champion Int'l Corp.*, 361 F. Supp. 2d 320, 327 (S.D.N.Y.2005)). It "cannot be proven merely by evidence that an employee . . . preferred not to continue working for that employer . . . [or that] the employee's working conditions were difficult or unpleasant." *Madray v. Long Island Univ.*, 789 F. Supp. 2d 403, 409-10 (E.D.N.Y. 2011 (alterations in original) (quoting *Spence v. Maryland Cas. Co.*, 995 F.2d 1147, 1156 (2d Cir. 1993)). Constructive discharge requires evidence (1) that the employer acted deliberately in bringing about the intolerable work conditions and (2) that the conditions were "intolerable." *Petrosino v. Bell Atl.*, 385 F.3d 210, 229 (2d Cir. 2004). To meet the first requirement, the plaintiff must show at a minimum that the employer acted deliberately in bringing about the intolerable work conditions. *Id*.; *see Swiderski v. Urban Outfitters, Inc.,* 2017 WL 6502221, at *13 (S.D.N.Y., Dec. 18, 2017) (The "Second Circuit requires a showing of intent in a constructive discharge claim; a plaintiff must establish that "there remains a genuine issue of material fact as to whether a defendant acted deliberately in engaging in conduct that created the workplace conditions at issue" in order to survive summary judgment.") (internal quotation marks omitted). To determine the second element, viz. whether the work conditions were "so

intolerable as to compel resignation," the condition must be "assessed objectively by reference to a reasonable person in the employee's position." *Petrosino*, 385 F.3d at 320.

Plaintiff maintains that "the law allows a jury to find an adverse action based on constructive discharge predicated only on the fact that Plaintiff's job was posted [during her maternity leave] . . . ." (Pl.s Mem in Opp. at 17.) However, this assertion is unsupported by any case law and its veracity is doubtful given the demanding nature of constructive discharge. Moreover, there is no admissible evidence that the position was posted during her maternity leave or that there was no difference between the posted position of Senior Director of Quality and the job that Plaintiff held.

Plaintiff also asserts that there are other actions "from which a jury may infer the intent to cause Plaintiff to quit." (*Id.*) These other acts include what she describes as "maligning her work ethic," "Bernstein's interrogation about Plaintiff's true intention as to her leave;" "falsely calling Plaintiff a 'liar' and 'manipulative' when she was on maternity leave, in correspondence sent to the Chief Executive Office based on inaccurate 'facts'"; "excluding her from vital activities in her department, including the decision to create a managerial position reporting to her and indeed hiding that decision until it was final and a candidate selected, as well as excluding her [sic] a meeting concerning Quality issues"; "not investigating her complaint of discrimination;" and "considering her failure to work when on maternity leave an abdication of her responsibilities." (Pl.'s Mem. in Opp. at 17-18.)

Initially, the Court notes that most, if not all, of the characterizations Plaintiff uses are unwarranted given the evidence submitted on this motion. The testimony regarding Stull's conversations with Bernstein do not support the assertion that she was "maligned" or the she was "interrogated" about her intent to return. Rather her own testimony is that there was one

conversation in which her return was discussed and she admits that "Bernstein *asked* [her] if she intended to return to work following her maternity leave." (Pl.'s 56.1 at 39 (emphasis added).) Nor are the comments that "people think you are slacking" and that she was taking too much time off and leaving early fairly characterized as "maligning" her work ethic.

In any event a number of Stull's complaint are common frustrations that occur in the employment context. That upper management may have decided to create a managerial position reporting to her without including her and failed to include her in one meeting, while perhaps unwise or unfair, is far from "intolerable." Jorgenson's email, like reprimands and negative evaluations constitute adverse actions only when they "trigger negative consequences to the conditions of employment." *Trachtenberg v. Dep't of Educ.*, 937 F. Supp. 2d 460, 472 (S.D.N.Y. 2013); *see also Sanders v. N.Y.C. Human Res. Admin.*, 361 F.3d 749, 756 (2d Cir. 2004) (holding that a negative employment evaluation and its critical addendum did not constitute an adverse employment action, because the plaintiff offered no proof that the evaluation had any effect on the terms and conditions of the plaintiff's employment); *Gutierrez v. City of N.Y.*, 756 F. Supp. 2d 491, 507–08 (S.D.N.Y. 2010) (holding that the plaintiffs' negative employment evaluations did not rise to the level of adverse employment actions); *see also Milne v. Navigant Consulting*, 2010 WL 4456853, at *8 (S.D.N.Y. Oct. 27, 2010) (A "supervisor's unavailability, apparent avoidance, micromanagement, [and] harsh, unsupported criticism" are not adverse employment actions (internal quotation marks omitted)). Where, as here, a plaintiff has not shown that negative consequences accompanied reprimands, district courts have repeatedly found no adverse employment action. *See, e.g., Frankel v. City of N.Y.*, 2009 WL 465645, at *3 & n.1 (S.D.N.Y. Feb. 25, 2009) (negative performance evaluations); *Siddiqi v. N.Y.C. Health & Hosps. Corp.*, 572 F. Supp. 2d 353, 367–68 (S.D.N.Y. 2008) (same); *Valentine v. Standard & Poor's,* 50

F. Supp. 2d 262, 283–84 (S.D.N.Y. 1999) (Sotomayor, J.) (same) Similarly, excessive questioning, micro-management, and threats of termination are insufficient to support a claim of constructive discharge *Cabrera v. CBS Corp.*, 2018 WL 1225260, at *8 (S.D.N.Y., 2018). *See Katz v. Beth Israel Med. Ctr.*, 2001 WL 11064, at *9 (S.D.N.Y. Jan. 4, 2001); *Hockeson v. N.Y.S. Office of Gen. Servs.*, 188 F. Supp. 2d 215, 220 (N.D.N.Y. 2002). *See also Shultz v. Congregation Shearith Israel of City of New York*, 867 F.3d 298, 308 (2d Cir. 2017) (allegations that (1) during her termination meeting she was met with silence when she expressed her concerns about finding another job while pregnant, and (2) after receiving the notice of termination, she overhead a phone call in which she was disparaged, her name was removed from a wall and newsletter and several people did not speak to her, all of which occurred over a period of a few weeks were insufficient to support claim of constructive discharge.); *Spence v. Md. Cas. Co.*, 995 F.2d 1147, 1149–52 (2d Cir.1993) (no constructive discharge when plaintiff was "ridiculed" by his supervisor, "harangued" by executives, written up and criticized for poor performance, threatened with termination, and placed on informal probation); *Martin v. Citibank, N.A.*, 762 F.2d 212, 221 (2d Cir.1985) (no constructive discharge when plaintiff had difficult relationship with supervisor). *See generally Miller v. Praxair, Inc.*, 408 Fed. App'x 408, 411 (2d Cir. 2010) ("Among the factors courts consider [in determining whether a hostile environment exists] are the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether its unreasonably interferes with the employee's work performance.") (internal quotation marks omitted).

Whether viewed individually or collectively, the acts relied upon by Stull are not sufficiently intolerable to support a claim of constructive discharge. As Stull has failed to put

forth evidence sufficient to demonstrate an adverse employment action, Defendant is entitled to summary claim dismissing her Title VII and NYSHRL claims.

## VI. The Retaliation Claim

To make out a prima facie case of retaliation, a plaintiff must show that "she engaged in protected participation or opposition under Title VII, that the employer was aware of this activity, that the employer took adverse action against the plaintiff, and that a causal connection exists between the protected activity and the adverse action, i.e., that a retaliatory motive played a part in the adverse employment action." *Sosa v. Rockland County Community College*, 2017 WL 3105872 (S.D.N.Y. July 20, 2017) (internal quotation marks omitted); *see Miller*, 408 Fed. App'x at 409-10.

Plaintiff has failed to raise a question of fact as to her retaliation claim. Stull's claimed protected activity is her conversation with Howell on October 23, 2015. However, she admits she never used the word "discrimination". In a retaliation claim, "[t]he onus is on the speaker to clarify to the employer that [s]he is complaining of unfair treatment due to [her] membership in a protected class and that [s]he is not complaining merely of unfair treatment generally." *Aspilaire v. Wyeth Pharm., Inc.*, 612 F. Supp. 2d 289, 308–09 (S.D.N.Y.2009). But even if plaintiff engaged in protected activity, the adverse actions upon which Plaintiff relies to support her constructive discharge claim, with one exception, occurred before her conversation with Howell on October 23, 2015 and thus cannot be causally connected. The only action that occurred after October 23, 2015 and before Stull's resignation was the email from Jorgenson, and there is no evidence that he was aware of Stull's conversation with Howell.[3]

Defendant is entitled to summary judgment on the retaliation claim.

---

[3] Moreover, it does not appear that the email would meet the standard for an adverse action in the context of a retaliation claim.

## CONCLUSION

For the reasons set forth above, defendant's motion for summary judgment is granted. The Clerk of Court is directed to enter judgment in favor of defendant dismissing plaintiff's claims and to close this case.

**SO ORDERED.**

Dated: Central Islip, New York  
      July 9, 2018

     s/ Denis R. Hurley  
     Denis R. Hurley  
     United States District Judge